# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                      Case No. 06-Cr-012

HORACIO MONTOYA,

    Defendant.

## MAGISTRATE JUDGE'S RECOMMENDATION TO THE HONORABLE RUDOLPH T. RANDA

## NATURE OF CASE

On January 18, 2006, a federal grand jury sitting in this district returned a two-count indictment against defendant Horacio Montoya. The defendant is charged in Count One of the indictment with being an illegal alien in possession of a firearm, which, prior to his possession of it, had been transported in interstate and foreign commerce, all in violation of 18 U.S.C. §§ 922(g)(5)(A) and 2. Count Two charges the defendant with possessing a firearm which was not registered to him in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. §§ 5861(d) and 5871.

On January 24, 2006, the defendant appeared before this court for arraignment, entering a plea of not guilty. Pursuant to the pretrial scheduling order issued at that time, the defendant has filed a motion to suppress physical evidence (Docket #12). This motion will be addressed herein.

## MOTION TO SUPPRESS PHYSICAL EVIDENCE

Defendant Horacio Montoya moves this court to suppress any and all physical evidence recovered by City of Milwaukee police officers during a warrantless entry and search of his residence located at 424 W. Washington Avenue, Apartment A, Milwaukee, Wisconsin, on July 14, 2005. On March 9, 2006, the court conducted an evidentiary hearing on the defendant's motion to suppress statements. At the hearing, Officer Thomas Obregon of the Milwaukee Police Department testified. Based on the evidence presented at the hearing, the court makes the following findings of fact.

## Findings of Fact

Milwaukee Police Department (MPD) Officer Thomas Obregon has known the defendant, Horacio Montoya, for about one year. He had talked to the defendant approximately four times before July 14, 2005, and also had seen the defendant on the street about a dozen times. Officer Obregon, who is a native Spanish speaker, has visited the defendant at his residence and has had conversations with him as a police officer. According to Officer Obregon, the defendant understands English, but has trouble speaking English. Therefore, when Officer Obregon speaks to the defendant, he speaks in Spanish.

Approximately one month before July 14, 2005, Officer Obregon and his partner, Todd Bohlen, went to 424A West Washington Avenue, Apartment A, as part of a gang investigation. They wanted to obtain the names of the persons at the residence and to determine if the residence was a gang house. Several people were at the residence, including the defendant. After the officers were given permission to enter the residence, Officer Obregon noticed gang paraphernalia in the apartment for a gang known as Brown Pride. The officers obtained oral

consent to search the apartment from an older man who resided there. The officers searched the apartment but no one was arrested. At that time, Officer Obregon did not speak with the defendant.

On July 14, 2005, Officer Obregon received information regarding a shooting which had occurred approximately 10 days previously. The shooting involved a rival gang, the Mexican Posse. Officer Obregon received information that the gun used in the shooting was located at 424 W. Washington Avenue, Apartment A. The house is a duplex with upper and lower residences. Apartment A is the upper unit. Officer Obregon and his partner went to the residence in an unmarked squad and parked across the street, accompanied by the MPD Gang Squad Unit. Officer Obregon was in plain clothes.

As Officers Obregon and Bohlen were getting out of the car, they observed a person in the window of the residence. The individual had taken a window fan out of the window and had stuck his head out. This individual was Eduardo Montoya, the defendant's cousin. Officer Obregon knew Mr. Montoya. Officer Obregon identified himself to Mr. Montoya as a Milwaukee police officer and said that he needed to speak to him. Mr. Montoya responded that Officer Obregon and the others should go to the back door of the residence.

Two officers were already at the back of the residence. Officers Obregon and Bohlen went to the back door and two officers remained in the front of the residence.

One of the officers knocked on the back door. The defendant came to the bottom of the stairs and opened the door. Officer Obregon advised the defendant in Spanish of the gang investigation and why they were at the residence. According to Officer Obregon, the defendant appeared to recognize him. Officer Obregon was wearing his badge on a chain and the

defendant knew he was a police officer.[1]  He was the only officer on the scene who spoke Spanish.

When the defendant opened the door, Officer Obregon called the defendant by his street name and told the defendant that he needed to talk to him.  Officer Obregon talked to the defendant in Spanish saying, "Trompo, necesitamos hablar," which translated means, "we need to talk."  Officer Obregon also said to the defendant, "vamos a hablar," which means "let's talk."  Officer Obregon, who did not have his gun drawn, asked the defendant for consent to search the residence for guns.  At that time, Officer Obregon was standing outside on the steps. The defendant responded, "Go ahead."  The defendant did not indicate that he did not want the officers to be there.  Officer Obregon advised the other officers that they were going upstairs to talk.

The six officers entered the building.  The defendant led them up the stairs to his residence.  The upper unit has two bedrooms, a kitchen, living room, small dining area and a bathroom.

Officer Obregon did not make an effort to get a warrant because he knew who lived at 424 W. Washington, Apartment A, and felt that he had built up a rapport in the past with both the defendant and Mr. Montoya.  He thought he could obtain consent and would not need to have 30 officers come to execute a search at the residence.  In Officer Obregon's prior contacts with the defendant, the defendant always provided the information that Officer Obregon requested.  He never refused.  Officer Obregon always found the defendant to be cooperative.

---

[1]On the day of the hearing, the defendant greeted Officer Obregon as "Tomas," the witness' first name in Spanish.

Officer Obregon and the other officers walked into the apartment, went through the kitchen and into the living room where they were met by Mr. Montoya. Officer Obregon explained to the defendant and Mr. Montoya that they were at the residence regarding the gun that was reportedly involved in the earlier shooting. Officer Obregon asked the defendant if there were any problems. The defendant said that he had had problems with the Mexican Posse, a rival gang. The defendant said that the Mexican Posse had conducted a drive-by shooting at their residence and that he believed the shooting was done by "Puppet" or "Little Puppet."

Officer Obregon then asked the defendant and Mr. Montoya in Spanish, "May I have consent to search?" The defendant responded, "Revisar," which means "search." Mr. Montoya said the same: "Revisa, no hay nada aqui," which translates to, "search, there is nothing here." Officer Obregon did not obtain a consent to search in writing.

Officer Obregon then pointed to the bedroom in the southeast corner and asked: "De quien es este cuarto?" which means "whose room is this?" Mr. Montoya answered that it was his room. Officer Obregon then looked toward the other bedroom and asked the defendant if that was his room and the defendant answered in the affirmative, "si." In response to Officer Obregon's question, the defendant said that no one else was living in the house, just Lalo (Eduardo). Officer Obregon then advised the other officers that they had been given consent to search. Officer Obregon did not recall if he asked the defendant if there were guns in the house before he asked for consent to search.

During the search, Officer Obregon found shotgun shells and .38 caliber bullets in Mr. Montoya's room. His partner searched the bathroom and, at some point, he asked Officer Obregon to come into the bathroom. Officer Bohlen had located a hidden compartment behind

- 5 -

the bathroom wall next to the sink. A shotgun was found behind the wall. The defendant continued to be cooperative and Officer Obregon did not draw his weapon during the search.

While the search was being conducted, the defendant was sitting in a chair in the living room across from Mr. Montoya. He was told to remain in the living room area where he and Mr. Montoya were observed by one of the officers. The defendant and Mr. Montoya were told to remain in the living room for the safety of the officers and for their own safety. It was a security issue for the officers, the defendant and Mr. Montoya because of the possibility of guns in the residence.

The defendant did not ask to leave the residence at any time. The defendant and Mr. Eduardo were free to leave while the search was being conducted, but they were not told that they could leave. They also were not told they did not have to consent to the search. On July 14, 2005, Officer Obregon did not know the defendant's level of education.

## **Analysis**

Warrantless searches are per se unreasonable under the Fourth Amendment, but are subject to specific exceptions. Mincey v. Arizona, 437 U.S. 385, 390 (1978); United States v. Robles, 37 F.3d 1260, 1263 (7th Cir. 1994). One of the exceptions to this general rule permits law enforcement officers conducting a search to enter a dwelling without a warrant if they obtain voluntary consent either from the individual whose property is to be searched or from a third party possessing common authority or joint control over the premises. United States v. Saadeh, 61 F.3d 510, 517 (7th Cir. 1995); United States v. Rosario, 962 F.2d 733, 736 (7th Cir. 1992) (citing Schneckloth v. Bustamonte, 412 U.S. 218 [1973] and United States v. Matlock, 415 U.S. 164 [1974]); see also, Florida v. Jimeno, 500 U.S. 248 (1991).

The standard for measuring the scope of an individual's consent under the Fourth Amendment "is that of 'objective' reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Jimeno, 500 U.S. at 251; Rodriguez, 497 U.S. 177; Dorsey, 27 F.3d at 285. The scope of a search is generally defined by its expressed object. Jimeno, 500 U.S. at 251; Ross, 456 U.S. 798 (1982). Moreover, consent searches are valid only if the consent was freely and voluntarily given. Schneckloth, 412 U.S. at 222; Saadeh, 61 F.3d at 517.

A person's knowledge of his right to refuse is not a prerequisite of a voluntary consent. Schneckloth, 412 U.S. at 234. Thus, the subject of a Fourth Amendment search need not be aware of the right to refuse to give knowing and voluntary consent. Id. at 234, 249.

To determine the voluntariness of a consent, the court must inquire whether, under the totality of the circumstances, law enforcement officers have overborne the will of the accused. Haynes v. State of Wash., 373 U.S. 503, 513-14 (1963); Schneckloth, 412 U.S. at 226. The court in Schneckloth detailed the factors to be considered when evaluating whether a defendant's "will was overborne" in the giving of statements:

> [T]he Court has assessed the totality of all the surrounding circumstances - both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account include the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.

412 U.S. at 226 (citations omitted).

In seeking suppression of the physical evidence obtained from the search of his residence, the defendant asserts that the law enforcement officers failed to obtain voluntary consent to conduct a warrantless search of his residence. Following the hearing, the defendant

- 7 -

submitted a supplemental letter brief in which he raises two additional issues related to the issue of consent to search based upon the testimony adduced at the hearing: 1) the question of whether the defendant's failure to object to the officers' warrantless entry into his residence is sufficient evidence of voluntary consent to enter, in the absence of a specific request by the officer for permission to enter, and 2) the application of the "fruit of the poisons tree" doctrine to the unlawful police entry into the defendant's residence.

In this case, the evidence establishes that MPD officers went to the defendant's residence on July 14, 2005, to investigate a gang shooting. After they arrived at the residence and were directed to go to the back door, the defendant came down the stairs and opened the door. Officer Obregon explained to the defendant in Spanish that they were there as part of an investigation into a gang shooting.

The defendant accurately points out that on cross-examination, Officer Obregon said to the defendant in Spanish, "we need to talk," and "let's go talk," and then told the other officers in English that he and the defendant were going upstairs to talk. The defendant, Officer Obregon and the other officers then proceeded up the stairs to the defendant's apartment. However, Officer Obregon's testimony on direct examination was more comprehensive and detailed. Officer Obregon clearly testified that he told the defendant in Spanish, "we need to talk," and "let's talk." At that time, Officer Obregon was standing on the steps outside the residence. Officer Obregon asked the defendant for consent to search the residence for guns. In response to his request for consent to search, Officer Obregon testified that the defendant said, "go ahead." The defendant then led Officer Obregon and the other officers up the stairs to his residence. Under the totality of the circumstances, the court finds that the defendant was asked and gave consent to search for guns in his residence.

- 8 -

There is no evidence to indicate that the defendant's consent to search was coerced or involuntarily given. Officer Obregon, who knew the defendant from prior encounters with him, explained to the defendant why the officers were at his residence. In their prior contacts, the defendant always had been cooperative and provided the information that Officer Obregon had requested. Officer Obregon was clearly identifiable as a law enforcement officer. Although he was in plain clothes, Officer Obregon was wearing his police identification on a chain around his neck. None of the officers had their weapons drawn.

Officer Obregon did not know the defendant's level of education. He spoke to the defendant in a normal tone of voice. The evidence before the court is devoid of any indication that the defendant's will was overborne by Officer Obregon or the other officers.

Considering the totality of the circumstances, this court concludes that the defendant freely and voluntarily consented to the search of his residence for weapons. Therefore, the "fruit of the poisonous tree" doctrine is not an issue in this case. Accordingly, this court will recommend that the defendant's motion to suppress physical evidence be **denied**.

## CONCLUSION

**NOW, THEREFORE, IT IS HEREBY RECOMMENDED** that the United States district judge enter an order **denying** defendant Horacio Montoya's motion to suppress physical evidence (Docket #12).

Your attention is directed to 28 U.S.C. § 636(b)(1)(A) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any

objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 22nd day of March, 2006.

BY THE COURT:

s/ Patricia J. Gorence
PATRICIA J. GORENCE
United States Magistrate Judge